1. The affidavits, offered in support of the evidence of witnesses for the purpose of obtaining a new trial on the ground of newly discovered evidence, and reciting that the witnesses lived at named addresses and, as to each witness, "that her associates are good, that she is of good character, and that her evidence is entitled to credit," did not meet the requirements of the Code, § 70-205, and the trial judge did not abuse his discretion in refusing to grant a new trial on this ground.
2. There being evidence for the State showing that the defendant killed the person named in the indictment without justification or mitigation, the verdict of the jury finding him guilty of murder was amply authorized.
 No. 15459. MAY 9, 1946.
Willie Henry Russaw was convicted in Upon Superior Court of the murder of Henry Green. He excepts to the judgment overruling his motion for new trial.
Lillie B. Green, the wife of Henry Green, sworn for the State, testified: The defendant, at about 11 o'clock on Saturday night, *Page 667 
October 20, 1945, killed Henry Green by shooting him one time with a double-barreled shotgun. At about 11 o'clock she and her husband were in bed. The defendant lived in the other side of the house. They had rented him a room until he could get somewhere to go. He had been living there about five months. The defendant pretended to be her brother-in-law, but he and her sister were not married. His wife or woman was her sister. The witness's attention was attracted by her sister's baby crying on the other side of the house. She asked her sister what was the matter, and the defendant told the baby, "God damn it, shut up." Then the defendant came around to her side of the house and knocked on the door twice, and her husband, Henry Green, woke up and said "What is that?" The defendant said, "Who in the God damn hell wants to know? Open up this door, you big-eyed son of a bitch, and you will see who it is." Henry Green put on his overalls and went to the door and said, "Willie Henry, what have I done to you? If I have done anything to you, come in and we will set down and talk about it." Before the defendant came in, he shoved the witness's sister and the baby in first, and came in behind them. When he came in the room he had a shotgun. Nobody else had a shotgun except the defendant. Henry Green did not have a weapon of any kind except a pocketknife in his pocket, which was found by the undertaker after he died. When the defendant came in the room with the shotgun, he and the deceased sat down and talked, the deceased asking the defendant, "Why are you made? Have I done anything to you? Why did you kick my door? I haven't done anything to you." The defendant replied, "I don't give a God damn." The deceased reached over to the fire place and got his shoes to put on, and the defendant asked him what he was putting them on for. The deceased replied, "What do you mean? What are you talking about?" The defendant said, "I don't give a God damn." The deceased took a cigarette from his shirt pocket and lit it and sat there a few minutes without saying anything. The defendant got up and went to the front door and pulled it open, and the deceased went to the door behind him, and when he did the witness was behind him, and the defendant threw up his shotgun and Henry Green reached out to take hold of it, but he was too late and the defendant shot him. He died on the way to the hospital. The gunshot wound *Page 668 
killed him. He never tried to do anything to the defendant at any time. He never made any threats. He did not make any kind of an attack on the defendant. The defendant left after he shot Henry Green. All of this happened in Upon County. There are two doors in the front of the house. One leads into the witness's part of the house, and the other into that part where the defendant lived. The defendant was drinking at that time. The shot took effect on the right side of the deceased under his breast. The witness's husband was not drinking. He had not been anywhere all that afternoon. The shooting took place in his front door. He fell over towards the defendant's door, and his feet were in the door. He was not killed about half way between the doors. The defendant got up out of his bed on his side of the house and came into the deceased's room. The witness did not think that the defendant had ever gone to bed, because during the first part of the night he and the witness's sister went to town in the afternoon. The defendant came in about dark and then went right back, and neither the witness nor her husband knew when he came back, and the witness's sister said that he beat her and put her out before he came to the witness's door. Henry Green and the defendant had not had any trouble before that night. Henry Green was going to the door behind the defendant to shut the door. He got up and let the defendant in when he knocked on the door. The witness did not know that the defendant had a gun until he came in her room with it. The deceased had nothing in his hand when he went to the door. There had not been a cross word between them before the shooting. There had never been any trouble between them before that time. The defendant shot Henry Green without any cause whatever.
The testimony of this witness was corroborated by the testimony of a number of other witnesses.
The defendant made the following statement: "I called Henry Green and asked him if he was in bed. He said, `No.' He asked me, did I want to see him. I said, `Yes.' He opened the door and said, `Come on in.' I said, `I have been here four months and have been hauling wood ever since February and you won't pay me.' He said, `Did you pay for it?' I said, `No.' He said, `If you didn't pay for it, I am not going to pay you a God damn cent.' I said, `Then don't burn it.' He said, `I will burn it as long as you *Page 669 
bring it here.' I said, `You better not.' He said, `Don't tell me what I shall not do. I will take this God damn stick and beat your head off.' I got the gun and came back and started out the door, and he had the stick in his hand and I shot him to keep him from killing me. All of the Greens want to be bad. I have been done shot twice. I told him to stop and he did not stop. He was coming sideways with the stick drawn back and I shot him. I did that to save myself. I knowed if he got to me with that stick he would have killed me."
In rebuttal, the State introduced a policeman, Joiner, who testified that while he had the defendant under arrest the defendant freely and voluntarily stated that he killed the deceased because, "Well, he was coming on me." The defendant said nothing about the deceased having a stick. The witness asked the defendant if the deceased had anything in his hand, and he said he did not see anything.
H. L. Watts testified that he was with Joiner at the time, and that the defendant freely and voluntarily made the statement that he shot the deceased, and said nothing about the deceased having a weapon of any kind, but said that the deceased was coming on him.
Grady Meeks testified that he asked the defendant why he wanted to kill the deceased, and the defendant replied, "I thought he had a knife."
The one special ground of the motion for new trial is based upon alleged newly discovered evidence, and consists of an affidavit by Lucy Bell Wiggins in which it is averred that it was too dark for her to see the defendant and the deceased, but that she knew the voice of each of them, and that they were cursing each other and were making noises by physical contact and scuffling. The commotion attracted her attention. The cursing, the commotion, and the scuffling took place on the porch of the house where the shooting was done. The affiant lived next door, and while she could not see them, she heard the deceased tell the defendant he was "going to bust his head open if he didn't get back in his side of the house," and just then the gun fired, and judging from the direction of the voice, the deceased was on the porch when he made the statement. The affidavit further asserted that the affiant knew the reputation of the deceased for violence and turbulence, and that such reputation *Page 670 
was bad. There was also an affidavit by Lucinda Thornton, in which it is asserted that the affiant, on October 20, 1945, and her baby by another man were living with the defendant in Thomaston, Georgia; that she and the defendant were occupying rooms in the same house with Henry Green and his wife. The affiant was not married to the defendant, and she and the defendant did not hold themselves out to the public or represent themselves to be husband and wife; that the defendant was in a good humor when she left, but when she got back from the restaurant about 11 o'clock, she heard loud talking and a commotion in the house, and stopped in the front yard of Lucy Bell Wiggins' house. There she heard the deceased tell the defendant that he did not intend to pay him for any wood, and that "he was not scared of any God damn negro that ever put on overalls and that he was going to bust his head open if he didn't get back in his side of the house." Then she heard the gunshot, and the defendant left the house.
The defendant and his counsel made affidavits that neither knew of the alleged newly discovered evidence contained in the Wiggins affidavit, nor could they have discovered the same by due diligence, which they had exercised; and that the defendant was confined in jail and was thereby deprived of an opportunity of contacting the witnesses, and did not have the financial means to secure the assistance of others in preparing the defense until he was indicted on Tuesday of the week immediately before his case was called for trial on the following Monday. He was indicted on the first Tuesday in November in 1945, and the court appointed counsel, who are the affiants; and the defendant, in talking with them, did not know of the knowledge of Lucy Bell Wiggins, and the defendant was told that Lucinda Thornton could not testify since he was living with her as his wife. The attorneys stated that they were informed by persons other than the defendant that Lucinda Thornton was his wife, and for that reason made no effort to have her testify in his behalf, in view of the rule making a wife incompetent to testify in behalf of her husband. They made diligent search, after their appointment, for witnesses as to the circumstances and matters relating to the killing, and were unable to discover or find Lucy Bell Wiggins before the trial. Her existence or her knowledge of the facts in connection with the case was unknown to them until after the trial. *Page 671 
Mrs. Cecil Harris and T. H. Starling each made supporting affidavits for the evidence of Lucinda Thornton, in each of which it is stated that she "lives at The Rock, Georgia, with her parents and on the Stephens place; that her associates are good; that she is of good character, and that her evidence is entitled to credit."
Mrs. S. S. Lee and J. H. Roberts made supporting affidavits for the evidence of Lucy Bell Wiggins, in each of which it is stated that she "lives at 816 Brown's Avenue, Thomaston, Georgia; that her associates are good; that she is of good character, and that her evidence is entitled to credit."
1. It is declared in the Code, § 70-205, that, "If the newly discovered evidence is that of witnesses, affidavits as to their residence, associates, means of knowledge, character and credibility must be adduced." In Blackwell v. Houston County, 168 Ga. 248, 256
(147 S.E. 574), the supporting affidavit recited "that said G. O. Harris bears a good reputation in the neighborhood in which he lives, and associates with the best people in the community, and in affiants' opinion is worthy, truthful, and entitled to belief." In the opinion this court said: "This affidavit is deficient in several respects. It alleges that this witness `keeps good company,' but fails to name his associates. . . This affidavit is silent as to his means of knowledge. This being so, the showing for a new trial on this ground was defective; and the judge did not abuse his discretion in refusing a new trial on this ground." In Anderson v. State, 190 Ga. 455, 460
(9 S.E.2d 642), the necessity for a compliance with the statutory requirements is stated as follows: "An affidavit in support of the witness upon whose newly discovered evidence a new trial is sought must give the names of his associates, a statement that he keeps good company not being sufficient to meet this requirement, which is necessary to enable the prosecution to make a counter-showing; and where such affidavit does not comply with this requirement, the trial judge does not abuse his discretion by refusing to grant a new trial on this ground." See, in this connection, Ivey v. State, 154 Ga. 63 (6) (113 S.E. 175);Cole v. State, 176 Ga. 135 (2) (167 S.E. 172); *Page 672 Sumner v. Sumner, 183 Ga. 400 (188 S.E. 515). The supporting affidavits in the instant case do not meet the requirements of law, and, hence, irrespective of whether or not the alleged newly discovered evidence would otherwise have authorized the grant of a new trial, this fatal defect authorized the trial judge to refuse a new trial on this ground.
2. The evidence abundantly supported the verdict, and the general grounds of the motion for new trial are without merit.
Judgment affirmed. All the Justices concur.